AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

6/24/2024

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ VV ___ DEPUTY

| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| KAI WHITNEY SOMMERS | ) | 2:24-mj-03754-DUTY |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____August 30, 2023_____ in the county of _____Los Angeles_____ in the

____Central____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 2252A(a)(5)(B) | (Possession of Child Pornography) |

LODGED
CLERK, U.S. DISTRICT COURT

JUN 24 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ rsm _____ DEPUTY

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____/s/ Kimberly Holeman_____
*Complainant's signature*

_____FBI SA Kimberly Holeman_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____06/24/2024_____

_____
*Judge's signature*

City and state: _____Los Angeles, California_____

_____Hon. Margo A. Rocconi_____
*Printed name and title*

*AUSA:* Derek R. Flores (x4896)

**AFFIDAVIT**

I, Kimberly Holeman, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against and arrest warrant for KAI WHITNEY SOMMERS ("SOMMERS"), a registered sex offender, for violation of 18 U.S.C. § 2252A(a)(5)(B) (Possession of Child Pornography) (the "SUBJECT OFFENSE").

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

3.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), assigned to the Ventura Resident Agency of the Los Angeles Field Office in the Central District of California.  I have been employed by the FBI since February 2010 and as a Special Agent since June 2012.  Prior to my employment

1

with the FBI, I obtained a Bachelor of Science in Computer Information Systems, a Master of Business Administration with an emphasis in Information Technology Management and was employed in the Telecommunication Industry for approximately seven years.

4.    During my tenure as a Special Agent, I have received training regarding computer technology crimes, violent crimes, child sexual exploitation crimes, human trafficking crimes, and have conducted and participated in numerous investigations of criminal activity.  During these investigations, I have executed and participated in the execution of various search and arrest warrants and seized evidence of violations of United States law.

5.    Currently, I am the coordinator of the Ventura County Child Exploitation Human Trafficking (VCCEHT) Task Force[1] assigned to investigate sexual exploitation of children as well as labor and sex trafficking of children and adult victims. Specifically, I am a federal law enforcement officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 1591, 2242, 2251, 2252A, and 2256 in the Central District of California as part of the VCCEHT task force, and I am authorized by law to request search and arrest warrants.

6.    Prior to my assignment at the Ventura Resident Agency, my experiences within the FBI have involved being assigned to the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team in Los Angeles.  As part of the SAFE

---

[1] VCCEHTTF is a federal task force which comprises eight law enforcement agencies throughout Ventura and Santa Barbara Counties.

Team, I was responsible for enforcing federal criminal statutes involving the sexual exploitation of children. Prior to the SAFE Team, I was assigned to the Los Angeles Cyber Division where I specialized in the investigation of both national security and criminal computer intrusions. While working criminal computer intrusions, I was assigned to the Electronic Crimes Task Force.

### III. **SUMMARY OF PROBABLE CAUSE**

7. As set forth in greater detail below, SOMMERS is a registered sex offender and the subject of an investigation for his role in the exploiting and attempting to exploit two minors (Victim 1 and Victim 2).

8. On September 15, 2021, SOMMERS was convicted by Los Angeles Sheriff Department (LASD) for violating Sections 261.5(d) (Statutory Rape) and 288(c)(1) (Lewd or lascivious acts with a child 14/15 years and offender 10+ years older) of the Penal Code and was sentenced to three (3) years eight (8) months in Los Angeles County (case PA096365-01). In the LASD case, SOMMERS enticed a 14-year-old female minor on an online application called "Kids Chat"[2] how to make extra money as an escort. Further, SOMMERS lured the 14-year-old to meet him two blocks from her house, where he picked her up and drove her back to his house. Once he got her into his house, he sexually assaulted her vaginally twice and anally three times. SOMMERS then washed her in the shower and took her home.

---

[2] Kids Chat is a messaging platform where older kids and teenagers aged 13-19 can connect with others from around the world.

9.    On June 14, 2023, SOMMERS was released on Post Release Community Supervision ("PRCS") in Los Angeles County and later accepted for supervision in Ventura County.  PRCS terms for SOMMERS include no access or possession of any digital devices that accessed the internet.

10.    On August 30, 2023, approximately two and half months after his release, the Ventura County Probation conducted a search at SOMMERS' residence and determined that he was in possession of digital devices that contained child sexual abuse material ("CSAM") and during this same month had been in communication with a minor on the messaging platform called "Teen Chat",[3] which is similar to how he lured the 14-year-old girl in his 2021 LASD conviction.

11.    The investigation was adopted by the Ventura County Child Exploitation Human Trafficking Task Force. During the review of SOMMERS devices seized by Ventura County Probation, law enforcement identified a 16-year-old female who resided in Washington DC that met SOMMERS on "Kids Chat" ("Victim 1") and a 14-year-old female who resided in Bakersfield, California that met SOMMERS on "Teen Chat" ("Victim 2") who SOMMERS requested they move the conversation to a secure application called "Session"[4] where he could entice and coerce the minors how to make extra money as an escort.  Neither Victim 1 nor Victim 2

---

[3] Teen Chat is a messaging platform where teens aged 13-19 can connect with other teens.
[4] Session is a cross-platform end-to-end encrypted instant messaging application emphasizing user confidentiality and anonymity.

knew of the other. Additionally, approximately 200 images of CSAM were located on SOMMERS' digital devices.

12.   During Victim 1's and Victim 2's separate chat communications with SOMMERS, he expressed his "rules" that they had to abide by, for example, "No panties (you will not wear panties when you are seeing a client)."

13.   Due to the enticement by SOMMERS, Victim 1 produced CSAM for SOMMERS that SOMMERS then used to advertise her as a purported "18-year-old" escort on MegaPersonals.[5] SOMMERS also attempted to entice Victim 2 to produce CSAM but Victim 2 provided fully clothed photos instead. SOMMERS still used Victim 2's photos to advertise her as a purported "18-year-old" escort on MegaPersonals.  SOMMERS pretended to be Victim 1 and Victim 2 while he communicated with the potential adult clients.  SOMMERS told the minors that if the clients asked how old they were, they had to say "18."

14.   SOMMERS ultimately coerced Victim 1 to meet with two adult men he found on MegaPersonals on separate occasions wherein oral copulation and sexual intercourse occurred in exchanged for a total of approximately $160.

**IV. <u>TRAINING AND EXPERIENCE ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE WORLDWIDE INTERNET COMPUTER COMMUNICATION NETWORK, AND DEFINITION OF TERMS</u>**

15.   In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The

---

[5] MegaPersonals is a classified personal hookup website for adults.

term "computer" is defined as set forth in 18 U.S.C.
§ 1030(e)(1).

16.  Based upon my training and experience in the
investigation of child pornography, and information related to
me by other law enforcement officers involved in the
investigation of child pornography, I know the following
information about the use of computers with child pornography:

17.  Computers and Child Pornography.  Computers and
computer technology have revolutionized the way in which child
pornography is produced, distributed, and utilized.  Child
pornographers can now produce both still and moving images
directly from a common video camera and can convert these images
into computer-readable formats.  The use of digital technology
has enabled child pornographers to electronically receive,
distribute, and possess large numbers of child exploitation
images and videos with other Internet users worldwide.

18.  File Storage.  Computer users can choose their method
of storing files: either on a computer's hard drive, an external
hard drive, a memory card, a USB thumb drive, a smart phone or
other digital media device, etc. (i.e., "locally") or on virtual
servers accessible from any digital device with an Internet
connection (i.e., "cloud storage").  Computer users frequently
transfer files from one location to another, such as from a
phone to a computer or from cloud storage to an external hard
drive.  Computer users also often create "backup," or duplicate,
copies of their files.  In this way, digital child pornography
is extremely mobile and such digital files are easily reproduced

and transported.  For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain.  Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets.  Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device.  Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

19.  <u>Internet</u>.  The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide.  The Internet is not an online service and has no real central hub.  It is a collection of tens of thousands of computer networks, online services, and single user components.  In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

20.  <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other

Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

21.  IP Addresses.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device.  Most ISPs control a range of IP Addresses.  The IP Address for a

user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

### V. <u>STATEMENT OF PROBABLE CAUSE</u>

22.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    SOMMERS Convicted and Sentenced for Statutory Rape and Lewd/Lascivious Acts with a Child in 2021 by LASD**

23.  On September 15, 2021, SOMMERS was convicted of violating Sections 261.5(d) (Statutory Rape) and 288(c)(1) (Lewd or lascivious acts with a child 14/15 years and offender 10+ years older) of the Penal Code and sentenced to three (3) years eight (8) months in Los Angeles County (case PA096365-01), after meeting a 14-year-old female minor on an online application called "Kids Chat"[6] wherein the two chatted for a two-day period. During the chats, SOMMERS asked the minor if she wanted to make extra money as an escort.  He explained she would go on dates with men where they would take her out, buy her food and give her money.  The minor agreed to be an escort and decided to meet SOMMERS.

24.  The minor met the defendant down the street from her home and got into his vehicle. While inside the vehicle, SOMMERS told her to delete their conversation and delete the Kids Chat

---

[6] Kids Chat is a messaging platform where older kids and teenagers aged 13-19 can connect with others from around the world.

application from her phone.  SOMMERS then asked her for her cell
phone.  After she handed it to him, SOMMERS threw it out the
window.  Once SOMMERS got her into his house, he sexually
assaulted her vaginally twice and anally three times.  SOMMERS
then washed her in the shower and took her home.

> a. On June 14, 2023, SOMMERS was released on Post
> Release Community Supervision in Los Angeles County
> and later accepted for supervision in Ventura
> County.

**B.    Ventura County Probation Search of SOMMERS Residence**

25.   On August 22, 2023, SOMMERS reported to Ventura County
Probation. Upon review of Ventura County Probation's report (Case
No. 2023017034/PA096365-01), I am aware that during the
appointment, the Deputy Probation Officer reviewed and explained
all of the Post Release Community Supervision ("PRCS") terms and
conditions to SOMMERS.  Upon completion of the reviewing
SOMMERS' terms, SOMMERS said he fully understood his terms and
was thankful for the explanation in such detail to him.  SOMMERS
signed his terms and conditions and was given a copy.

26.   Among SOMMERS probation terms there was a section that
prohibited communication with anyone under the age of 18. He was
also prohibited from possessing anything depicting persons under
18 years of age engaged in sexual conduct (CSAM). The terms also
said SOMMERS' property was subject to search, with or without a
search warrant, by any peace officer for evidence related to
violations of his probation.

27.   On August 30, 2023, approximately two and half months after his release, the Ventura County Probation conducted a search at SOMMERS' home address 2691 Sereno Avenue, Ventura, California and determined that he was in possession of possession of four cell phones and two laptop computers.  All the devices could access the internet.  A search of SOMMERS' cell phone which he was using, as recently as that morning, revealed communication with minor females via chat rooms and text messaging applications.  In addition, a photograph of what appeared to be an underage female.  When Probation questioned SOMMERS about the female being underage, SOMMERS admitted she was a minor he met in a "teen chat room."

28.   Further, a search of SOMMERS' internet capable devices revealed CSAM images of children in sexually suggestive poses including, young girls in underwear and young girls exposing their bare breasts, buttocks, and vagina. Additional devices seized were a 64 GB USB drive, and one external hard drive.

29.   Due to SOMMERS violation of his PRCS terms and conditions, he was taken into custody at the Ventura County Jail for 180 days.

30.   On or about August 31, 2023, the case was adopted by the Ventura County Child Exploitation Human Trafficking Task Force.

**C.   SOMMERS Entices Victim 1**

31.   On January 17, 2024, Victim 1 was interviewed by an FBI Child Adolescent Forensic Interviewer (CAFI) in Washington, DC, where Victim 1 resides.  Victim 1 was 16 years old at the

time of the CAFI and 16 years old when she met SOMMERS online. During this interview, Victim 1 shared that she met a guy from "California" who sent her a direct message on Kidschat who would arrange for her to do sex acts in exchange for money.

32.  Victim 1 first met SOMMERS on Kidschat, her profile displayed her age of 16 years old, and that she lived in Washington, DC.  While on Kidschat, SOMMERS messaged her and asked where she was from?  Victim 1 said, "DC."  Further, SOMMERS asked why she needed money?  Victim 1 responded because her "family was struggling."  SOMMERS never said much in response and just asked if she wanted to work for him. Approximately after an hour of chatting on Kidschat, SOMMERS moved the conversation over to TextNow, then eventually over to Sessions because text was not secure.  In my training and experience, I believe SOMMERS moved Victim 1 over to Sessions because it is an encrypted messaging platform and more secure to conduct illegal activity.

33.  Upon review of several TextNow conversations, several were related to commercial sex work.  SOMMERS was the user of TextNow telephone number ending in -4748 (the "-4748 phone number").  In the conversations SOMMERS posed as Victim 1 and attempted to set up "dates" for commercial sex with multiple clients.  There were numerous conversations between SOMMERS and people with area codes 301, 240, and 202 about arranging commercial sex.  These area codes were in and around the area of Washington DC where Victim 1 resided.  Therefore, whenever SOMMERS communicated with anyone with those area codes, he was

12

likely attempting to set up dates for Victim 1.  As an example, in one conversation with a phone number ending in -6958, SOMMERS asked the client to pick her up at a Washington, DC address near Victim 1's residence.

34.  Another text thread was located between SOMMERS and a phone number ending in -6214 (the "-6214 phone number") that took place from August 20, 2023, at 9:21:27 PM(UTC) to August 29, 2023, at 2:53:35 AM(UTC).  The content of this conversation indicated that SOMMERS set up a date for Victim 1 wherein she ultimately met with the client and performed oral sex on him. Additionally, Victim 1 recorded an approximate 3 minute 30 second video of her orally copulating the client inside a vehicle while he sat in the driver seat and later sent it to SOMMERS.  The following is a summary of the conversation between SOMMERS and the client:

35.  The conversation began with a missed call from the client with the -6214 phone number.  SOMMERS sent a text and asked the client what he was looking for. The client replied he was looking for "Bbbj", which based on my training and experience, I know stands for "bareback blowjob".  This means the client wanted oral sex with no condom.  The client asked where she was located, and SOMMERS replied, in the Kingman Park area. An internet search for Kingman Park showed it was a residential neighborhood in Washington, DC.  SOMMERS later gave the client an address for pick up in Washington, DC near Victim 1's residence (same address as above).  SOMMERS and the client agreed on the "Bbbj" for $60.  At approximately 9:28:00 PM(UTC)

on August 20, 2023, the client sent an estimated time of arrival of 20 minutes and provided a description of his vehicle as a white work truck. At approximately 9:46:17 PM(UTC) the client gave an updated estimated time of arrival of 2 minutes.  At 9:50:03 PM(UTC) the conversation ended for that day on August 20,2023 because the client had picked up Victim 1 and they drove under a bridge where she performed commercial sex in exchange for $60.00 USD.

36.  On August 29, 2023, at approximately 12:27:31 AM(UTC) the same client called SOMMERS. SOMMERS again portrayed to be Victim 1 and replied she could meet the client the following day after 12pm.  The client asked for Victim 1 name and address. SOMMERS replied they had met before and added "I sucked you affiliated and we filmed it."  SOMMERS asked if the client remembered and the client replied, "Yea we was by the boats." The conversation with the client abruptly ended at 2:53:35 AM(UTC) on August 29, 2023.

37.  Also located were text messages between Victim 1 and SOMMERS between August 21, 2023, at 12:01:19 AM(UTC) and August 28, 2023, at 12:21:01 AM(UTC) on TextNow.  In the text messages SOMMERS referred to himself as "daddy," which based on my training and experience, is a name a sex trafficker requires his victims to refer to him as. Victim 1 wanted to make sure she was chatting with SOMMERS, so she said "Daddy who? Remind me". SOMMERS replied with "The guy who had you working you made $160". Based on this statement I took it to mean that Victim 1

had performed commercial sex work at the direction of SOMMERS
where she had already earned $160.00 USD.

38.  SOMMERS asked Victim 1 to switch to chatting on
"Session" because "Text," meaning "TextNow", was not secure.
Their conversation ended at 12:21:01 AM(UTC) August 28, 2023,
presumably because they switched to texting on the "Sessions"
application.  Upon review of their TextNow messages, it appears
that Victim 1 had sent SOMMERS images.  It is believed that
these were the images that are located within SOMMERS devices
and do contain CSAM images of Victim 1 as a visual depiction,
one image is of Victim 1 seated on a chair spreading her vagina
with her fingers. There are also multiple images of Victim 1
breasts.  During the CAFI, Victim 1 confirmed the images were
her and that she did send CSAM images to SOMMERS.

39.  Upon review of the Sessions text messages between
SOMMERS and Victim 1, majority of the content of their
conversations was about Victim 1 doing commercial sex work at
the direction of SOMMERS.  They discussed SOMMERS' rules for
working, such as, Victim 1 was "not to wear panties when she was
with a client" and to "always collect the money up front."
There was a portion of the chat dated August 28, 2023, at
1:03:09 AM(UTC) wherein SOMMERS told Victim 1, "Also see if the
guys you meet up will let you film like the first one did I
thought that video was so amazing baby."  Also located was a
message where Victim 1 asked SOMMERS, "If I may ask. . . what
site do u find these people on?" SOMMERS responded, "I can't
tell you. It's for your safety I don't tell you."  SOMMERS asked

15

why Victim 1 wanted to know and her response was that she was, "Just wondering tbh [to be honest]." SOMMERS reassured her with, "It's all good. Just better you don't know" followed with, "Remind me what is your height, weight, and boob size?" To which, Victim 1 provided her height, weight, and boob size wherein I am aware was later used in the Megapersonal advertisement posted by SOMMERS of Victim 1.

        **D.**    **SOMMERS Entices Victim 2**

    40. On January 26, 2024, Victim 2 was interviewed by an FBI CAFI. Although Victim 2 was 14 years old at the time of the CAFI, she was 13 years old when she met SOMMERS online. During this interview, Victim 2 shared that she met a "sex trafficker" who sent her a direct message on Teenchat. The conversation initially was about money, she did not know he would ask her to do "weird things." Victim 2's Teenchat profile contained her username; her profile picture, which was an anime picture; her age, 13; her mood, lonely; and, country of U.S. SOMMERS had a Guest profile, so there was nothing to view. While on Teenchat, SOMMERS asked to move onto another messenger application where chats would not be recognized and required a password to access. Victim 2 could not remember the name of the application however, I am aware that the application was Session because the following chat messages were located on SOMMERS phone.

    41. Text messages took place from approximately August 29, 2023, through August 30, 2023, wherein SOMMERS was talking to Victim 2's username. SOMMERS' username was "Element123." Throughout the messages Victim 2 provided her true first name.

Law Enforcement was able to identify Victim 2 in part through her providing her true first name.  SOMMERS asked Victim 2 if she knew what escorting was and if she wanted to "make some real money."  Victim 2 responded with, "Escorting? Isn't that when you remove someone from somewhere?"  SOMMERS messaged Victim 2 that "escorting is getting paid to go on dates."  He explained that he will find guys for her.  Victim 2 shared that she was only allowed to date boys 13-15 years old because her mother will only allow her to date boys that are three years older than her.  Despite Victim 2 sharing her age range of being approximately 12 to 13 years old, SOMMERS told her that most of the guys will be in their 20's to 30's.  Further, SOMMERS even told Victim 2, "no one has to know" and "you really shouldn't tell your parents about this."  After Victim 2 expressed that her mother looks through her phone, SOMMERS guided her on how to avoid getting caught by messaging, "I guess you could right down the recovery phrase and just delete the app then reinstall it when you want to chat with me the recovery phrase let's you pull up your chat history."

42.  To gain an understanding of what SOMMERS was requesting from Victim 2, she began asking what the dates contained. SOMMERS indicated that, "the dates are easy most guys just want bjs or sex."  Victim 2 asked "Is it weird that I'm a virgin?" and SOMMERS replied, "no that's cool and you can just do bjs or anal if you want to stay a virgin or id you want to lose it do sex it's all up to you."  SOMMERS then said it was "$60-bj only", "$100 sex/anal" and "it's very common for girls

17

to do anal to stay a virgin." Victim 2 asked about ages and who arranged the dates. SOMMERS told her, "20's-30's mostly. 30's mostly but sometimes older if you ok with that. If not I can put a cap on the oldest age you be ok seeing. Youngest 18 but occasionally 16 or 17 but that's rare." SOMMERS confirmed that the dates would be in her area and that he would be the one to arrange the dates and will tell her the details. SOMMERS just asked that Victim 2 let him know when she could work.

43. Victim 2 tried to figure how she could meet the clients and messaged SOMMERS, "Can we talk about it first? Because I have school and I need to tell my mom that I'm hanging out with "friends"." SOMMERS responded with "Ok that works. Or you can sneak out at night. Its up to you. We can figure it out."

44. At this point in the messages SOMMERS began asking Victim 2 for photos, "Send me 4-5 good pics of yourself if you can". To which, Victim 2 sent a headshot photo of her face. SOMMERS responded to the photo with, "You are very beautiful. I need 4 more pics. Please". Victim 2 sent four more pictures that are a sequence of headshots from the first one. SOMMERS responded with, "Need pics with your body. Don't have to nude can be what ever. And you can use pics already on your phone if you want. You are so beautiful." Victim 2 then sent two additional photos. The photos are of Victim 2 and another minor wherein both are fully clothed. SOMMERS requested, "Any other body pics. You are so beautiful. Or you can take one for me either way. Yep I mean it you are gorgeous. Body Pic? I need one

18

with out your friend." Victim 2 sent one more picture of herself fully clothed standing in front of a mirror. SOMMERS response was, "Prefect. I may ask for other pics later down the road but this would for now. Your body is so amazing." Victim 2 made a comment about the size of her chest however, SOMMERS reassured Victim 2, "That's ok. What is your height, weight, boob size? Small boobs can be very sexy." Victim 2 responded with "Oh I'm 5'0", 114 lbs., 32A" followed with SOMMERS, "So adorable I love it". In my training and experience the "You are so beautiful", "Yep I mean it you are gorgeous", "Your body is so amazing" and, "So adorable I love it" comments from SOMMERS are a way of grooming and enticing Victim 2 with a flood of compliments so that she can become more comfortable in sharing vulnerable CSAM photos of herself with SOMMERS down the road.

45.   SOMMERS gave Victim 2 the name of "Amy" to use with the clients and asked Victim 2 what her real name was. After Victim 2 shared her real name, SOMMERS said, "Nice to meet you I am Ben but my girls call me daddy. Is that ok with you to call me daddy" Victim 2 agreed, and SOMMERS responded, "I see it as a sign of respect you respect me I respect you". Then Victim 2 shared that she had daddy issues and SOMMERS responded with, "I promise I am not like your daddy I take care of my Girls treat them right and with respect." In my training and experience, to be called "Daddy" is used by pimps or sex traffickers because they financially "care" for prostitutes, much like how a father provides for his own child's financial needs.

46.   At this point in the messages, they discussed what
Victim 2 was comfortable with doing. SOMMERS gave tips on how to
do certain sexual acts for example, " bjs are easy it's like
sucking a popsicle and anal is good if you use lots of lube
(lotion works great as lube) and you will stay a virgin. one tip
is you can use your hair brush handle to train your ass be sure
to use lots of lotion as lube and take it slow."

47.   SOMMERS escalated his request for what type of photos
he was wanting from Victim 2, "So any pics of your but can be
non nude. Butt*. Mirror selfie would work." Victim 2 asked, "So
I can have shorts on in the pic?" SOMMERS, "If you want or take
them off either way off is better but do what you feel
comfortable with. It's up to you." After Victim 2 sent pictures
of her wearing shorts SOMMERS said, "Nice ass. I love it. Wish I
could see it naked." Victim 2 said, "Maybe tonight." SOMMERS
escalated the request for specific pictures even further for
Victim 2 to produce CSAM by asking, "And see your pussy and
boobs too if that's ok. What ever you feel comfortable showing
it's all good".

48.   Victim 2 began to ask when the first date was. SOMMERS
asked when she wanted to start, followed by sending his seven
rules[7] to Victim 2 SOMMERS asked Victim 2 what her address was so
he could have clients meet her down the street.  Victim 2
provided her address and asked to work between 1:00AM or 2:00AM

---

[7] The seven rules are further described in section E:
"SOMMERS' Seven Rules for Victim 1 and Victim 2 to Follow"

since she will need to sneak out of her house.  SOMMERS offered,
"We can start with bj only and see if I can get one guy to meet
up with you".  SOMMERS again reminded her of the rules, "And
remember money upfront before you do anything and no wearing
panties". Victim 2 questioned, "What do you mean by that? Like
they have to pay first?". To which SOMMERS said, "Yes pay first
before you blow him. Always pay upfront. And you understand no
panties right?"

49.  SOMMERS claimed to have had this job for the last ten
years and that he preferred to have two to three girls working
at a time. Currently he had two, including Victim 2 SOMMERS
messaged how to sneak out without getting caught and to tell the
clients that she is 18 years old, no matter what. Victim 2 asked
why 18. SOMMERS responded with, "the guys want you to say that
it's just easier. Makes it simpler for you". In my training and
experience, SOMMERS knew that since the girls were actual minors
and the potential clients were under the impression that the
"sex workers" were "adults" at 18 years old, SOMMERS was aware
of his illegal activity of trafficking minors to conduct
commercial sex acts and did not want to get caught.

50.  Victim 2 asked if she could quit whenever and SOMMERS
said that she could. At one point SOMMERS sent a picture of an
adult male as a potential client, and asked Victim 2 what she
thought of him. Victim 2 then expressed she was starting to
regret it and SOMMERS tried to console her by telling her she
does not have to meet with him and that he could find her

different guys. Victim 2 ended up stopping her conversation with SOMMERS and no longer continued contact.

**E.    SOMMERS' Seven Rules for Victim 1 and Victim 2 to Follow for Commercial Sex Acts**

51.   Within the notes section of SOMMERS' Google Pixel 4, he created a note on August 28, 2023, titled "Work". The note contained Victim 1' first name, her home address, the address SOMMERS used for clients to pick-up Victim 1, her height, weight, boob size, and a dollar amount of $160. The note also contained Victim 2's first name with "Amy" in parentheses, her address, city, height, weight, and boob size. Additionally in the note were the following rules that is believed SOMMERS messaged Victim 1 on an unknown date prior to August 28, 2023, because during a Sessions message with Victim 1 on August 28, 2023, at 12:34:46 AM(UTC+0), SOMMERS asked Victim 1, "And do you remember the rules baby. Ok tell me what you remember of the rules". To which, Victim 1 responded, "I remember no underwear and get money up front". I am also aware that on August 30, 2023, at 12:54:20 AM(UTC+0) SOMMERS messaged Victim 2 on Sessions the full set of rules:

> a. 1. You never have to do anything you don't want to it's your body your decision if you feel uncomfortable let me know.

> b. 2. No panties (you will not wear panties when you are seeing a client.)

    c. 3. When I text you please reply in a timely fashion unless you are with a client I understand or driving lol don't want you to crash.

    d. 4. If you can't work on a certain day or time frame let me know as soon as you can.

    e. 5. If you are on your period let me know you can still work but let me know (makeup sponges will be your friend of you decide you still want to work).

    f. 6. Always let me know when you arrive at client's place and when you are done with client.

    g. 7. Money always up front with clients

    h. Communication is key to a successful working relationship remember you work for me all I ask if you follow my simple rules and be open and honest and this will go smoothly.

**F.   SOMMERS Advertises Victim 1 and Victim 2 for Commercial Sex Acts**

52.   On or about October 18, 2023, I contacted VCCEHT Task Force Officer (TFO) Nan Jiang who is a Human Trafficking Detective with the Ventura County Sheriff's Department and requested TFO Jiang to query the -4748 phone number, which I know is used by SOMMERS for any potential returns in Spotlight[8]. On this same day, TFO Jiang returned the following four MegaPersonal advertisements of Victim 1 and Victim 2, wherein SOMMERS advertised them as purported 18-year-old adults:

    a. <u>**Commercial Sex Advertisement #1 (Victim 1)**</u>

---

[8] Spotlight is a web-based application that law enforcement can query for commercial sex advertisements online.

    i.   **Date/Time:** August 20, 2023, at 17:29 (UTC)

    ii.  **Titled:** "Let's Have Fun Bareback"

    iii. **Name:** [Victim 1's first name]

    iv.  **Age:** 18

    v.   **Telephone Number:** the -4748 phone number

    vi.  **City:** Washington, DC

    vii. **Location:** Kingman Park

    viii.   **Description:** "BBW LOOKING FOR FUN ASK ABOUT MY BABREBACK SPECIAL. GREAT RATES. OUTCALLS ONLY. TEXT ONLY"

    ix.  **Images in Advertisement:** Approximately eleven (11) total images of Victim 1. Of the 11 images, four (4) are CSAM; three are of Victim 1 breasts, and one is of Victim 1' vagina.

**b. <u>Commercial Sex Advertisement #2 (Victim 1)</u>**

    i.   **Date/Time:** August 20, 2023, at 21:05 (UTC)

    ii.  **Titled:** "Let's Have Fun Bareback"

    iii. **Name:** [Victim 1's first name]

    iv.  **Age:** 18

    v.   **Telephone Number:** the -4748 phone number

    vi.  **City:** Washington, DC

    vii. **Location:** Kingman Park

    viii.   **Description:** "BBW LOOKING FOR FUN ASK ABOUT MY BABREBACK SPECIAL. GREAT RATES. OUTCALLS ONLY. TEXT ONLY"

    ix.  **Images in Advertisement:** Approximately eleven (11) total images of Victim 1. Of the 11

images, four (4) are CSAM; three are of Victim 1 breasts, and one is of Victim 1's vagina.

**c. Commercial Sex Advertisement #3 (Victim 1)**

i.   **Date/Time:** August 28, 2023, at 20:48 (UTC)

ii.  **Titled:** "SPECIALIST"

iii. **Name:** [blank]

iv.  **Age:** 18

v.   **Telephone Number:** the -4748 phone number

vi.  **City:** Washington, DC

vii. **Location:** Kingman Park

viii.   **Description:** "BBW LOOKING FOR FUN ASK ABOUT MY BABREBACK SPECIAL. GREAT RATES. OUTCALLS ONLY. TEXT ONLY"

ix.  **Images in Advertisement:** Approximately twelve (12) total images of Victim 1. Of the 12 images, four eight (8) are CSAM; seven are of Victim 1 breasts, and one is of Victim 1 sitting in a chair spreading her vagina with her fingers and face is exposed.

**d. Commercial Sex Advertisement #4 (Victim 2)**

i.   **Date/Time:** August 30, 2023, at 03:59 (UTC)

ii.  **Titled:** "Head Special"

iii. **Name:** [Blank]

iv.  **Age:** 18

v.   **Telephone Number:** the -4748 phone number

vi.  **City:** Bakersfield, CA

vii. **Location:** Stockdale West/Bakersfield

viii.   **Description:** "Ask about my Bj special
Text me to set something up. Come pick me up lets
do this. Car date. Text Only."

ix. **Images in Advertisement:** Approximately two
(2) clothed images were included of Victim 2

53.   Upon review of the SOMMERS' TextNow messages, it was
evident that he was pretending to be Victim 1 or Victim 2 by
messaging potential clients for commercial sex dates with both
minors. SOMMERS attempted to arrange meeting times and discussed
pricing for sexual favors.

54.   An example of when SOMMERS effected a commercial sex
act and portrayed Victim 1 as an adult escort, was on August 20,
2023, at 17:38 (UTC), when a client using a telephone number
ending in -7012 sent text message, "Available" to SOMMERS' -4748
phone number through TextNow. SOMMERS responded with "I will be
tomorrow. Out call only[9]". It is probable that this client
responded to the MegaPersonals advertisement SOMMERS published
on August 20, 2023, at 17:29 (UTC) for Victim 1 The following
day at 15:49 (UTC), the same client sent a follow up text
message with Victim 1' name and "You available. For outcall."
And SOMMERS responded, "Yes if you pick me up". The two discuss
the price of $100.00 USD and the client agreed to send a Lyft to
pick Victim 1 up. SOMMERS provided an address in Washington, DC
near Victim 1's residence (same address as above). The messages

---

[9] "Out Call" is used in commercial sex to indicate that the
sex act may take place at the client's residence or anywhere
other than the escorts location.

continue with SOMMERS asking what the client wanted and for how
long. The client wanted a half hour of full service (sex) and
bareback (no condom). While SOMMERS was texting the client, he
was also texting Victim 1 with the arrangement he made and where
the Lyft was in route to picking her up. Victim 1 got into the
Lyft and went to the client's location. When Victim 1 arrived,
SOMMERS sent a text to the client, "I am here. Should I knock on
the door baby". Victim 1 met this client for commercial sex and
received $96.00 USD. During Victim 1' CAFI she recalled it was
supposed to be $100.00 USD, but she did not count the cash until
after while on her way back home in the Lyft. While messaging,
SOMMERS also asked the client, "By the way can you film it it's
for my personal use only. If that's ok with you. I won't film
your face or anything. Let me know if that's ok. It's ok if you
don't want to film it." The client never responded to SOMMERS'
request and therefore SOMMERS messaged, "Never mind".

55.  Although the commercial sex act was not effected on
Victim 2, SOMMERS did attempt to portray and advertise her as an
adult escort. For instances, on August 30, 2023, at 03:38 (UTC),
when a client using a telephone number ending in -5268 sent text
message "Hi baby 😊" to SOMMERS' -4748 phone number through
TextNow. It is probable that this client responded to the
MegaPersonals advertisement SOMMERS published on August 30,
2023, at 03:33 (UTC)[10] for Victim 2. SOMMERS responded, "Can you

---

[10] Based on an admin subpoena to MegaPersonals, I am aware
that the Victim 2's advertisement was published seven times at
UTC times of 02:30, 03:00, 03:16, 03:33, 03:59, 04:15, and
04:30.

do car date". SOMMERS asked if the client could "pick me up" and asked where the client was located. The client responded with an area of, "Mt Vernon and Kentucky". SOMMERS mentioned, "But I am looking to do car date babe". To which the client agreed then sent, "Oh ok. Bbbj babe. I eat pussy to. If you like." SOMMERS returned, "No eating my pussy. Bbbj [bareback blowjob] in fine. Can you do $60. How old are you?" The client responded, "42. I'm black." and then sent a picture per SOMMERS' request. I believe this is the same client that SOMMERS sent Victim 2 a picture and ask, "What do you think of this guy?" on August 30, 2023, at 03:55 (UTC) in their Session conversation. The client in return requested a picture wherein SOMMERS sent three non CSAM images of Victim 2. The client responded, "You are beautiful. I have ID. Bbbj [bareback blowjob] cim [come in mouth] babe. You over 18?" To which SOMMERS responded, "I am 18". SOMMERS ended up canceling the arrangement because Victim 2 began to regret the idea and asked to quit.

**G.   SOMMERS Possesses CSAM on his Phone**

56.   Upon review of the High-Tech Task Force report for the Google Pixel 4 seized from SOMMERS, approximately 149 images depicting CSAM. The images showed pre-pubescent females and males subjected to different sex acts with adult males. The sex acts included oral copulation, vaginal penetration, and sodomy. There was one image of an infant that appeared to be under 3 years of age. There was another image that showed an unconscious male victim being sodomized. The victims in the above mentioned CSAM material appeared to be under 18 years of age based on upon

their physical development and youthful facial features. On or about February 21, 2024, I submitted the 149 files to the National Center for Missing and Exploited Children's (NCMEC) Child Recognition & Identification System (CRIS). Of the 149 potential CSAM images, 51 images were child victims who have been identified by law enforcement. Of the 51 images, 11 have a victim information report.

57.   Also located were several email addresses that appeared to belong to SOMMERS. Some of the email addresses located included kaisommers@yahoo.com, and kaielement@hotmail.com. Additional email addresses used on the device included youngmodels123entertainment@gmail.com, and averageasianpod@gmail.com.

58.   Based on my training and experience and review of the devices, the CSAM on Sommers' Google Pixel 4 was produced and transported using digital devices that had been shipped in or affected interstate commerce.

**H.   The IP Addresses Associated with the Enticement Trace Back to SOMMERS' Residence**

59.   On or about November 21, 2023, I submitted an administrative subpoena to TextNow for subscriber information associated with the -4748 phone number for the period of January 01, 2023, through November 7, 2023. On or about December 1, 2023, TextNow returned the following pertinent information:

      a. Username: youngmodels123entert

      b. Email: youngmodels123entertainment@gmail.com

      c. Registration Date: 2023-07-21 17:37:28 UTC

        d. Registration IP: 47.33.99.17

        e. Phone Ownership From: 2023-07-21 17:38:01 UTC

        f. Phone Ownership To: 2023-09-30 10:33:44 UTC

60.  On or about December 4, 2023, I submitted an administrative subpoena to Charter Communications for subscriber information associated to IP address 47.33.99.17 on July 21, 2023, which was associated with the TextNow account. On or about December 8, 2023, Charter Communications returned the following pertinent information:

        a. Subscriber Name: RAND HAVENER[11]

        b. Service Address: 2691 SERENO AVE, VENTURA, CA 93003

        c. Lease Start Date: 08/17/2022 05:45 PM

        d. Lease End Date: 10/27/2023 01:54 PM

61.  SOMMERS is a registered sex offender, with 2691 SERENO AVE, VENTURA, CA 93003, as his place of residence.

62.  On or about January 11, 2024, an administrative subpoena was issued to MegaPersonals for account information associated to e-mail address youngmodels123entertainment@gmail.com, averageasianpod@gmail.com, or the -4748 phone number, for ads posted on 08/20/2023, 08/28/2023 and 08/30/2023. On this same date, Megapersonals responded with eight published advertisements that were associated to Victim 1 and Victim 2 and previously located by TFO Jiang. There was only one IP address that published each post and that was from IP address

---

[11] According to public records, this is SOMMERS' mom's romantic partner who SOMMERS lives with.

47.33.99.17, which was associated with SOMMERS' residence as noted above.

## VI. <u>CONCLUSION</u>

63.  For all the reasons described above, there is probable cause to believe that SOMMERS has violated the SUBJECT OFFENSE.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 24th day of June, 2024.

_____
UNITED STATES MAGISTRATE JUDGE